UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| RHONDA GOLEY, and LORA HILL, | ) |
| | ) |
| Plaintiffs, | ) 3:22-CV-00014-DCLC-DCP |
| | ) |
| v. | ) |
| | ) |
| CONSOLIDATED NUCLEAR SECURITY, LLC, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court to address Defendant's motion for summary judgment. Defendant filed a Motion for Summary Judgment [Doc. 22] on October 30, 2023. Plaintiff responded in opposition [Doc. 25] and Defendant has filed a reply [Doc. 29]. These matters are ripe for resolution. For the reasons that follow, Defendant's Motion for Summary Judgment [Doc. 22] is **GRANTED**.

**I.     BACKGROUND**

Defendant Consolidated Nuclear Security ("Defendant") is the management and operational contractor for Y-12 National Security Complex ("Y-12") in Oak Ridge, Tennessee [Doc. 26, ¶ 1]. Y-12 is a "national security complex that manufactures, develops, and stores nuclear weapons" including the processing and storage of uranium and has established rigorous protocols to ensure the "safe, continuous, and efficient plant operations while maintaining employee and community safety." [Doc. 1, pg. 2. ¶¶ 3, 10]. Plaintiffs are employees of Defendant and allege that when Defendant created a new management structure in 2018, it discriminated against them on the basis of their sex by paying them less than their male counterparts, asserting

1

claims under the Equal Pay Act of 1963, 29 U.S.C. § 203 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

A.     **The pre-2018 management structure**

Prior to 2018, the Y-12 Operations Center employed a Plant Shift Superintendent ("PSS") and a Control Center Specialist ("CCS") who were responsible for running the Y-12 Operations Center which serves as "the command center for all Y-12 operations 24 hours a day, seven days a week, including holidays" [*Id.* at ¶ 2]. The person in the PSS position needed "extensive knowledge" of the buildings on site and the emergency response protocols and procedures for "front line response to emergencies" [*Id.*]. The person had to have a four-year degree and seven to ten years of operational experience, or eighteen years of progressive relevant experience [Doc. 26, ¶ 24]. They also had to have managerial or other experience demonstrating "critical decision-making skills" because of the "enormous responsibility associated with nuclear weapons emergency operations." [Doc. 26, ¶ 25]. The PSS position was the go-to person in case of a crisis and served as the "Emergency Director," [*Id.* at ¶ 8], and could transform the Operations Center into an Emergency Control Center during a crisis. The PSS had the immediate decision-making authority in such a crisis until a formal chain of command was established [*Id.*]. On the other hand, the person in the CCS position did not have to have the same extensive knowledge as the PSS and did not have the PSS's decision-making authority. Instead, the CCS executed the PSS's directions [*Id.* at ¶ 11]. A 4-year degree was not necessary to work in the CCS position. The CCS was also responsible for facilitating communication with the PSS and fielding telephone and radio inquiries [*Id.*]. The salary for the PSS position was greater than that of the CCS position (*Id.* at ¶¶ 5, 37).

B.     **The 2018 Restructuring**

In 2018, Defendant restructured its staffing model at Y-12. Rather than employing a PSS and CCS structure, Defendant created two PSS positions: PSS Specialist and PSS Senior Specialist [*Id.* at ¶ 20]. Both would staff the Operations Center during every shift. [*Id.* at ¶¶ 17-18]. What distinguished these two positions, according to Defendant, was that the Senior Specialist had extensive managerial and critical decision-making skills that the Specialist had yet to acquire [Doc. 24, pg. 3]. Accordingly, Defendant paid PSS Senior Specialists a higher salary to reflect that difference [Doc. 24-1, pg. 22, ¶ 11].

Because it was eliminating the CCS position, Defendant developed a training program to qualify current CCS employees for the new PSS Specialist position [Doc. 26, ¶ 19]. It took approximately one year to complete the program and qualify as a PSS Specialist [*Id.* at ¶ 35]. Meanwhile, the CCS employees continued to perform their normal job duties while training [*Id.* at ¶ 36]. Once promoted to a PSS Specialist, the salary was determined based on the employee's relevant experience, education, and time in the current position, and was between Levels I through K. [*Id.* at ¶ 40]. PSS Specialists start at Level I and Senior Specialist at Level K.

The responsibility also changed after restructuring. Now, at the beginning of a shift, either the PSS Specialist or the PSS Senior Specialist could serve as the designated Emergency Director – referred to as "PSS-1" - in the event of a crisis [*Id.* at ¶ 26]. Whereas before only the PSS could serve in that capacity, now both the PSS Specialist and the PSS Senior Specialist could serve as Emergency Director [Doc. 26-2, pgs. 19, 20, 29]

C.     **Plaintiffs' positions and advancement**

Ms. Goley has an associate's degree in applied science and general technology [Doc. 26, ¶ 28]. Ms. Goley also received a baccalaureate equivalent degree from Defendant in 2019 [Doc. 25-

3

5, pg. 1]. Prior to 2020, Ms. Goley worked in "non-exempt administrative positions" at Y-12 [Doc. 26, ¶ 29]. Ms. Hill has a bachelor's degree in professional studies, with a concentration in organizational leadership, and a master's degree in business administration [*Id.* at ¶31]. Prior to 2020, Ms. Hill worked in administrative positions at Y-12 [*Id.* at ¶ 32].

On January 16, 2019, Tony Charles ("Mr. Charles"), Plaintiffs' supervisor [Doc. 26-2, pgs. 50, 51, 55], announced the advancement training program for CCS employees to qualify for the PSS Specialist positions [Doc. 26, ¶ 34]. Both Ms. Goley and Ms. Hill indicated that they were interested in the promotion opportunity [*Id.* at ¶ 38].

In February 2020, Ms. Patricia Toney ("Ms. Toney") became the first CCS employee to complete the training and otherwise qualify for the PSS Specialist position [Doc. 26, ¶ 59]. Defendant placed Ms. Toney in Compensation Level I with a salary of $93,175 [*Id.* at ¶ 60]. January 2022, Defendant promoted Ms. Toney to a PSS Senior Specialist at Compensation Level K [*Id.* at ¶ 63].

In November 2020, Ms. Goley successfully completed the training program and qualified for the PSS Specialist position. Defendant promoted her from her CCS position to the PSS Specialist at Compensation Level I, and a starting salary of $93,175.00 [*Id.* at ¶¶ 64-65, 67]. Both Ms. Goley's and Ms. Toney's starting salaries as PSS Specialists were greater than their male counterpart's, Mr. Gallagher's, starting salary [*Id.* ¶ 68].

Although Ms. Goley's compensation was greater than Mr. Gallagher's, she raised the salary differences between the Specialist and Senior Specialist positions as an issue [*Id.* at ¶ 71]. Ms. Sybil Cannon, Defendant's Compensation Specialist, explained to Ms. Goley that compensation differences related to "management" and "supervisory type experience" [*Id.* at ¶ 72]. Ms. Cannon also explained that a PSS Specialist needed eighteen months of work experience in

4

that position prior to qualifying for the Senior Specialist promotion [*Id.* at ¶ 73; Doc. 24-1, ¶ 5]. On November 27, 2020, Ms. Goley inquired by email to Mr. Thomas Hayden, Senior Director of Y-12 Safeguards and Security, asking "Are the newly 'Qualified PSS' (who are all females) considered less valuable and why does the same statement (per the attached memo) not apply to them?" [Doc. 26, ¶ 74]. Mr. Hayden described the new two-tier PSS model was a "new construct that recognizes a need for some career progression in this area" [*Id.* at ¶ 75].

By November 2020, Ms. Hill completed her training and was qualified for the PSS Specialist position. Like for Ms. Goley, Defendant promoted Ms. Hill to PSS Specialist at Compensation Level I [*Id.* at ¶¶ 76-77]. Ms. Hill's new salary as a PSS Specialist was $93,175.42, which was an increase of 30.6% over her current salary [*Id.* at ¶ 79]. Defendant also awarded her a $2,500 special recognition award [*Id.* at ¶ 80]. A few months later, on April 12, 2021, Ms. Hill asked Ms. Cannon by email for written confirmation that she would be paid at Level K and not Level I. The following day Ms. Cannon responded that Ms. Hill would be eligible for a promotion to Senior Specialist in eighteen months [*Id.* at ¶¶ 84-85]. This was approximately the same time both Mr. Gallagher and Ms. Toney served as Specialist before being promoted to Senior Specialist.

At Defendant's company, promotions are not automatic. On May 26, 2022, Mr. Robert Jenkins ("Mr. Jenkins"), Plaintiff's manager following their promotion to PSS Specialists [Doc. 24-1, pgs. 38-41], recommended that Ms. Goley and Ms. Hill for a promotion to PSS Senior Specialist [Doc. 26, ¶¶ 86-87]. At that time, neither received the promotion. In February 2023, Mr. Jenkins requested Ms. Goley be promoted to Senior Specialist at Compensation Level K [Doc. 26, ¶ 89]. In an email requesting Ms. Goley be promoted to PSS Senior Specialist, Mr. Jenkins recommended "a job code level promotion from I to K to bring [Ms. Goley] more in line with her peers and male counterparts who have comparable education, training, and related experience as

5

well as retain the employee due to increased job scope and responsibility [*Id.* at ¶ 93]. At this point, however, Mr. Jenkins did not request an increase in her salary. [*Id.*]. Defendant assigned Ms. Goley to Compensation Level K but her salary remained at $107,575.00 which was within the Level K compensation range [Doc. 26, ¶ 91-93].

In February 2023, Mr. Jenkins requested a similar promotion for Ms. Hill with the specific request that she be promoted to Senior Specialist at Compensation Level K [Doc. 26, ¶ 94]. Again, he did not request a salary increase for her [*Id.*]. In response, Defendant promoted Ms. Hill to Senior Specialist and increased her salary to $108,618.00 [Doc. 26, ¶ 96]. Her increase put her salary in the Level K range [Doc. 26, ¶ 97].

**C.     Comparators**

In October 2018, Defendant hired W. Dale Stewart as a PSS Senior Specialist at Compensation Level K and a salary of $128,845.86 [*Id.* at ¶ 47]. Mr. Steward has a bachelor's degree in business and public relations and had prior managerial experience as a "manager in security" [Doc. 26-4, pg. 35].

In February 2019, Defendant hired Brent Gallagher ("Mr. Gallagher") as a PSS Specialist [Doc. 26 at ¶ 51]. Mr. Gallagher had a bachelor's degree in electrical engineering and worked as an engineer at Y-12 [*Id.* at ¶ 52]. But unlike Mr. Stewart, Mr. Gallagher had no "supervisory experience" or managerial experience in his prior work experience and, as a result, Defendant brought him on as a PSS Specialist at a Compensation Level I, with a salary of $92, 242 [*Id.* at ¶¶ 53-54; Doc. 24-1, pg. 19]. More than a year and a half later, in November 2020, Defendant promoted Mr. Gallagher to PSS Senior Specialist, and increased his salary to $101,515 at Compensation Level K [Doc. 26, ¶¶ 57-58; Doc. 24-1, pg. 20].

6

In October 2020, Defendant hired Mr. Justin Davis ("Mr. Davis") as a PSS Senior Specialist with a salary of $133,440.84 [*Id.* at 101]. Mr. Davis had a master's degree in emergency management and had "extensive management and leadership experience" in his prior jobs at Y-12 [*Id.* at ¶¶ 102-103]. Mr. Davis had worked as a Section Manager in Performance Assurance since 2017 [*Id.* at ¶ 104]. Mr. Davis's previous compensation was at Level M, placing him in a higher salary range than his peers [*Id.* at ¶ 106]. Defendant noted that this pay range was commiserate with his advanced educational degree and years of work experience. Mr. Davis met

> most, if not all of the Preferred Requirements noted for this posting. His progressive educational history culminates with a master's degree in security. His professional career is equally progressive and includes 18+ yrs of security related support and site-specific experience. The offer recommended is based on his experience and education in comparison with his peers.

[*Id.* at 107]. At the time of Mr. Davis' promotion, the only other Senior Specialist with a master's degree was a female. And, although they had similar educational backgrounds, Mr. Davis' salary was less than the female's salary [Doc. 26, ¶ 108]. In other words, a female was the highest paid PSS Senior Specialist when Defendant promoted Mr. Davis [*Id.* at ¶¶ 108-109].

On October 18, 2021, Defendant hired Mr. Justin Smith ("Mr. Smith") as a PSS Specialist [*Id.* at ¶ 98]. Mr. Smith had worked for Defendant in a "performance assurance" position earning $89,372.92 at Compensation Level I [*Id.* at ¶ 99]. The promotion did not change Mr. Smith's compensation as he remained in Compensation Level I as a PSS Specialist.

## II. LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts

7

contained in the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "come forward with significant probative evidence showing that a genuine issue exists for trial." *McKinley v. Bowlen*, 8 F. App'x 488, 491 (6th Cir. 2001). The nonmoving party "may not rest upon mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the nonmoving party based on the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986).

### III.    ANALYSIS

Plaintiffs pursues their wage discrimination claims against Defendant under two distinct statutory provisions, the Equal Pay Act of 1963, 29 U.S.C. § 203 *et seq.,* and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, claiming that they were paid less than their co-workers for similar work. The Court begins with the Equal Pay Act.

#### A.    Equal Pay Act

Under the Equal Pay Act, employers are prohibited from "paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work." *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006) (citing 29 U.S.C. § 206(d)(1). To establish a prima facie case of wage discrimination under the Equal Pay Act, plaintiffs must show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar

8

working conditions." *Id.* at 359-60 (*citing Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). In this case, Defendant concedes that Plaintiffs established a prima facie case that they performed equal work to the male PSS Senior Specialists, who were paid more [Doc. 24, pg. 6].

After a plaintiff has established a prima facie Equal Pay Act violation, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions, supported by admissible evidence that "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)(quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). At this point, the defendant "bears both the burden of persuasion and production on its affirmative defenses." *Beck-Wilson*, 441 F.3d at 365 (citing *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998). In wage discrimination claims, a legitimate non-discriminatory reason may include one of the four affirmative defenses found in the EPA. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021)(citing *Beck-Wilson*, 441 F.3d at 369). A defendant can show the "wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998). Finally, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the Defendant's proffered reasons were a mere pretext for discrimination. *Wright*, 455 F.3d at 707-08. Here the plaintiff "must come forward with evidence that the defendant's reason for the employment action is false," but he "need not present independent evidence that the proffered reason is pretext for [ ] discrimination." *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003) (citing *Reeves v. Sanderson*

9

*Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

Having conceded that Plaintiffs can show a prima facie case of discrimination, Defendant explains the differences in salary were the result of factors unrelate to sex, including the employee's years of prior work experience with Y-12, their educational background, and their level of critical decision-making skills acquired through their work experiences [Doc. 24, pg. 6]. The Court now turns to those justifications.

### 1. Legitimate Business Reasons

Defendant asserts that it paid PSS Specialists, including Plaintiffs, less than PSS Senior Specialists for legitimate business reasons unrelated to sex [Doc. 24, pg. 6]. Until 2019 when it restructured the staffing requirements at its Operational Center, the qualifications for the PSS position included a four-year degree, seven to ten years of operational experience, or eighteen years of progressive relevant experience, and managerial or other experience demonstrating critical decision-making skills [*Id.* at 7; Doc. 26, ¶¶ 16, 24-25]. At that time, the PSS position had only one level of compensation.

Defendant chose in 2018 to restructure the staffing requirements by eliminating the CCS position and creating two different PSS positions: the PSS Specialist and Senior Specialist. It also changed the qualifications to become a PSS Specialist. Specifically, it created a training program that would permit those who were employed as a CCS the opportunity to become PSS Specialists; however, this training did not confer the same "extensive managerial and critical decision-making experience held by PSS Senior Specialists" [Doc. 24, pg. 7]. Defendant contends that it created the pay differential between PSS Specialists and PSS Senior Specialists to account for the difference between existing PSS Specialists, who became PSS Senior Specialists in the new two-tier system, and individuals hired as PSS Specialists, who did not have the same education and

10

experience in their background [*Id.*].

To support its contention that it paid PSS Specialists, including Plaintiffs, less than PSS Senior Specialists for legitimate business reasons, Defendant argues that 1) Plaintiffs are asking the Court to ignore Defendant's business judgment that managerial and critical decision-making experience in stressful situations – like a crisis at a nuclear weapons facility - is an important reason for the pay differential, 2) Plaintiff's fail to account for the difference in education and experience between themselves and PSS Senior Specialists, 3) PSS Senior Specialists had much greater experience in either the PSS role or in managerial roles requiring critical decision-making in stressful situations, and 4) Plaintiffs present no evidence that their gender played a role in Defendant's decision to create Compensation Level I PSS Specialist and Compensation Level K PSS Senior Specialists [*Id.* at 8-9].

Plaintiffs respond that Defendant's argument that Plaintiffs did not automatically gain the same extensive managerial and critical decision-making experience is inconsistent with Defendant's practice of recognizing "experience gained from various facilities and positions" [Doc. 25, pg. 10]. Specifically, in 2018 Defendant hired Mr. Stewart as a PSS Senior Specialist even though he had no previous experience as a CCS or a PSS [*Id.*]. Also, Defendant hired Mr. Davis as a PSS Senior Specialist, and his previous position was a Performance Assurance Manager [*Id.*]. Plaintiffs argue that Defendant considered experience outside of the CCS and PSS position when hiring Mr. Stewart and Mr. Davis, and disregarded Plaintiffs' experience as CCS employees when hiring them as PSS Specialists. Plaintiffs argue that as CCS employees, they performed "all the essential job duties" of the PSS Senior Specialist position, thereby gaining experience in the role before completing their training [*Id.*].

In the context of safeguarding nuclear weapons, Defendant's reasons to consider managerial experience and critical decision-making skills in determining PSS Specialist and PSS Senior Specialist compensation are legitimate reasons other than sex [Doc. 26, ¶¶ 25, 40]. It is undisputed that Defendant is the management and operational contractor for Y-12 National Security Complex Y-12, [Doc. 26, ¶ 1], which is a "national security complex that manufactures, develops, and stores nuclear weapons." [Doc. 1, pg. 2. ¶ 10]. The Court can think of no other type of business activity where such critical decision-making skills are of utmost importance in providing for community safety [*See* Doc. 26, ¶ 3]. Plaintiffs argue that their previous experience as CCS employees gave them similar skills in management and critical decision making [Doc. 25, pg. 11]. However, the record does not support Plaintiffs' contention that they have the same requisite managerial experience to qualify for a Compensation Level K when they were initially promoted to the PSS Specialist positions. And the comparators they cite have backgrounds that are qualitatively different than theirs that justify Defendant treating them differently. Mr. Steward has a bachelor's degree in business and public relations with previous security related managerial experience [Doc. 26-4, pg. 35]. Mr. Davis has a master's degree in emergency management and "extensive management and leadership experience" in his prior jobs at Y-12 [Doc. 26 at ¶¶ 102-103].

It is undisputed that in the pre-2018 employment structure, the PSS led all emergency response action until a formal chain of command was completed, with the CCS employees following the PSS's directions [Doc. 26, ¶¶ 8, 11]. Plaintiffs assert that if a PSS left the Operations Center, a CCS had direction to perform the PSS's duties until they returned [*Id.* at ¶ 12]. However, temporary authority during a PSS's theoretical absence does not establish equivalent managerial and critical decision-making skills as that possessed by the PSS Senior Specialist. Moreover,

Defendant used the Compensation Level I-K range in determining PSS Specialists' salary, including Plaintiffs' salaries [Doc. 24-1, pg. 22, ¶ 11]. The Compensation Level I-K was consistent with the job posting for the PSS positions before the two-tier system was applied [Doc. 26, ¶¶ 41, 43; Doc. 24-1, pgs. 13-15]. Plaintiffs qualified for the PSS Specialist position because they completed Defendant's training program and did not have similar managerial or critical decision-making skills as those Defendant promoted to the Senior Specialist positions. Accordingly, it was not discriminatory for Defendant to reflect those differences in salary. *See* Doc. 26, ¶¶ 69, 111, 137.

The Court finds that Defendant had legitimate reasons to prioritize management and critical decision-making skills when analyzing the Compensation Levels for PSS Specialists and PSS Senior Specialists. Even Plaintiffs agree that "managerial and critical-decision making experience in stressful situations is an important factor in the PSS position" [Doc. 26, ¶ 111]. Accordingly, the Court will not substitute its judgment for that of Defendant. *See Washington Cnty. v. Gunther*, 452 U.S. 161, 171, (1981) (holding under the EPA courts "are not permitted to substitute their judgment for the judgment of the employer . . . who has established and applied a bona fide job rating system, so long as it does not discriminate on the basis of sex") (internal quotation omitted).

### 2. Neutral Application of Education and Experience Analysis

Defendant asserts that following the implementation of the two-tiered system, Defendant consistently applied its education and experience analysis in assigning level and pay to employees, regardless of gender [Doc. 24, pg. 9]. Defendant asserts its neutral application of these factors is evidenced by its pay decisions regarding employees, including Plaintiffs, Mr. Gallagher, and Mr. Smith [*Id.* at 10].

Plaintiffs respond that Defendant did not neutrally apply the education and experience analysis in setting employee salaries [Doc. 25, pg. 11]. Plaintiffs argue that Defendant inconsistently considers education in salary decisions, citing Defendant's claim that it considered Mr. Davis's master's degree when determining his compensation [*Id.* at 12]. Plaintiffs assert that Mr. Davis does not have a master's degree in emergency management [*Id.*]. Plaintiffs note that Defendant claimed when it determined the highest paid PSS Senior Specialist's salary, Defendant considered her master's degree, which was in education [Doc. 25, pg. 12]. Plaintiffs note that Ms. Hill has a master's degree in business administration. Thus, Defendant is not being consistent in its treatment of those with advanced educational degrees. [*Id.*].

Plaintiffs also respond that Defendant inconsistently considers employee experience when determining compensation [*Id.* at 13]. Plaintiffs contend that Defendant's two-tier compensation system was essentially a seniority system [*Id.*]. Citing *E.E.O.C. v. Shelby Cnty. Gov't, Bd. of Cnty. Comm'rs*, 707 F. Supp. 969, 983–84, 1988 WL 149455 (W.D. Tenn. 1988), Plaintiffs argue that for Defendant's seniority system to provide a valid defense, "there must be a bona fide seniority system that is uniformly applied" [*Id.*]. Plaintiffs assert that Defendant hired male employees, including Mr. Davis, as PSS Senior Specialists without having any prior experience as a PSS employee [*Id.*]. Further, Defendant hired Mr. Stewart as a PSS Senior Specialist and paid him at a higher level than it paid Plaintiffs. Defendant required Ms. Goley to train Mr. Stewart [*Id.*]. Thus, Plaintiff's argue that Defendant has not proven why "unqualified, untrained, less educated males should be paid more than Plaintiffs" [*Id.*].

Plaintiffs assert that their experience as CCS employees, who worked in the PSS's office alongside the PSS, is relevant management experience [*Id.*]. Plaintiffs argue that unlike Mr. Davis and Mr. Stewart, Plaintiffs have "actually observed and shared job duties with the PSS for years"

before being promoted to PSS Specialists [*Id.*]. Plaintiffs argue that it is "irrefutable" that they had much more "experience in and exposure to" the PSS position than Mr. Davis or Mr. Stewart [*Id.*].

Despite arguing to the contrary in their brief [Doc. 25, pg. 12], Plaintiffs admitted in their response to Defendant's material facts that Mr. Davis has "extensive management and leadership experience" in his previous positions at Y-12 [Doc. 26, ¶¶ 102-103]. He worked as a Section Manager in Performance Assurance since 2017 [*Id.* at ¶ 104]. As part of determining Mr. Davis' salary, Defendant considered his previous position and his assignment to Compensation Level M, which placed him in a higher salary range [*Id.* at ¶ 106]. It was not discriminatory for Defendant to consider Mr. Davis current compensation level in deciding his pay as a PSS Senior Specialist. It was likewise not discriminatory for Defendant to consider that Mr. Stewart had worked in a security management position before Defendant hired him as a PSS Senior Specialist [Doc. 26-4, pg. 35]. As previously discussed, the Court finds that Defendant's two-tier PSS Specialist and PSS Senior Specialist structure is a "bona fide job rating system." *See Washington Cnty. v. Gunther*, 452 U.S. at 171. Defendant initially promoted all CCS employees who completed the training program to the PSS Specialist position and promoted the PSS employees to the PSS Senior Specialist position. Defendant also hired Mr. Davis and Mr. Stewart as PSS Senior Specialists because Defendant determined they were otherwise qualified by having managerial and critical decision-making skills. And, at the time Defendant hired Mr. Davis, the highest paid PSS Senior Specialist was a woman – not a man [Doc. 26, ¶ 109]. Defendant has established that it neutrally applied education and experience analysis when determining employee pay.

   **3. Male PSS Senior Specialists Not Valid Comparators for Plaintiffs**

Defendant argues that PSS Senior Specialists are not valid comparators [Doc. 24, pg. 14].

Plaintiffs named Mr. Stewart and Mr. Davis as comparators, but Defendant argues that neither Mr. Davis nor Mr. Stewart were hired as PSS Senior Specialists from a CCS position or any other administrative, non-exempt position [*Id.* at pg. 14]. Defendant argues that both Mr. Davis and Mr. Stewart had the requisite managerial and critical-decision making experience for the PSS Senior Specialist Compensation Levels [*Id.*].

Plaintiffs respond that male PSS Senior Specialists are valid comparators for Plaintiffs [Doc. 25, pg. 14]. They argue the qualifications for both the PSS Specialist and PSS Senior Specialist are the same and each position performs the same job duties [*Id.*]. For each shift, the employees designate a PSS 1 and a PSS 2, and both PSS Specialists and PSS Senior Specialists can be designated as either [*Id.*]. Plaintiffs contend that at all relevant times they performed identical work to Mr. Davis and Mr. Stewart. They say this is supported by Defendant's eliminating the CCS position when it implemented the two-tier PSS Specialist and PSS Senior Specialist system [*Id.*].

Defendant concedes that Plaintiffs have established a prima facie case showing that Plaintiffs performed the same work as the male PSS Senior Specialists [Doc. 24, pg. 6]. However, the Court finds that Plaintiffs did not have the same qualifications or skills as the PSS Senior Specialists. Accordingly, Defendant had a legitimate business reason to pay PSS Senior Specialists more than PSS Specialists.

    **4.    Defendant's training program to Exempt Position and Higher Salary Refutes Claims of Discrimination.**

Defendant argues that because of its creation of the advancement pathway, Plaintiffs were able to become PSS Specialists and earn significant salary increases [Doc. 24, pg. 17]. These salary increases negate Petitioners' claims that Defendant discriminated against them due to their sex [*Id.*]. Plaintiffs respond that Defendant's creation of the training program leading to a

16

promotion and higher compensation does not negate their claims of sex discrimination because Defendant created the program for the purpose of implementing its two-tiered PSS Specialist and PSS Senior Specialist structure [Doc. 25, pgs. 15-16]. Plaintiffs contend that even if the program resulted in higher salaries for Plaintiffs, it cannot be presumed that Defendant did not discriminate against them in their positions as PSSs [*Id.* at 16]. The Court agrees with the Plaintiff that simply establishing the training program for Petitioners to become PSS Specialists does not negate their claims of discrimination. However, as previously discussed, Defendant has established legitimate business reasons for the salary differential.

### 5. Plaintiffs Cannot Show Evidence Defendant's Reasons for Pay Differential Were Pretextual.

Defendant argues that because it has proven one of the affirmative defenses, Plaintiffs have the burden to show evidence that Defendant's reasons for the pay differential are pretextual, and they have failed to meet that burden [Doc. 24, pg. 18]. Plaintiffs respond that Defendant's reasons for paying Plaintiffs less than men are pretextual [Doc. 25, pg. 16]. Plaintiffs can show pretext by "'an indirect evidentiary showing that the employer's explanation is not credible.'" *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 513 (6th Cir. 2021)(quoting *Peters v. Lincoln Elec. Co*., 285 F.3d 456, 470 (6th Cir. 2002). But Defendants have consistently promoted those with managerial experience and/or critical decision-making skills to the Senior Specialist position regardless of the individual's sex. The highest paid PSS is a female. And it only promoted Mr. Gallagher, an engineer at Y-12, to a PSS Specialist position and not a Senior Specialist position because he lacked the supervisory experience Defendant believed was needed for the higher promotion. [Docs. 26, ¶ 53-54; 24-1, pg. 19]. Mr. Stewart was hired as a Senior Specialist but, again, he had prior managerial experience that Plaintiffs simply did not have that would have warranted the higher promotion. Thus, Plaintiffs have failed to show the reasons justifying the distinction between the Specialist position

17

and the Senior Specialist position are pretextual. Accordingly, Defendant is entitled to summary judgment on Plaintiff's Equal Pay Act claim as there is no genuine issue of material fact in dispute and Defendant is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 323.

### B. Title VII Claim

"[W]hen an Equal Pay Act claim and a Title VII claim arise out of the same set of underlying facts, both stating a charge of wage discrimination, the standards of liability under the two statutes are sufficiently similar that the disposition with respect to the two claims should be the same." *Clark v. Johnson & Higgins*, 181 F.3d 100 (6th Cir. 1999) (quoting *Korte v. Diemer,* 909 F.2d 954, 957 (6th Cir.1990)). Thus, the "analysis of a claim of unequal pay for equal work is essentially the same under both the Equal Pay Act and Title VII," and a "finding of 'sex discrimination in compensation' under Title VII is tantamount to a finding of 'pay discrimination on the basis of sex' under the Equal Pay Act." *Id.* at 957-59 (internal quotations omitted). Also, "any violation of the Equal Pay Act is also a violation of Title VII." *Id.*; *see also* 29 C.F.R. § 1620.27(a). Having determined that Plaintiffs cannot establish that Defendant violated the Equal Pay Act, they have failed to establish a violation of Title VII. Accordingly, Defendant's motion for summary judgment on Plaintiffs' Title VII claim is **GRANTED**.

## IV. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment [Doc. 22] is **GRANTED**. It is further **ORDERED** that Plaintiff's claims are **DISMISSED WITH PREJUDICE**. A separate judgment shall enter.

SO ORDERED:

s/ Clifton L. Corker
United States District Judge